Good morning, Counsel. Good morning, Your Honors. Lindsay Battles on behalf of the plaintiff. Excuse me, Aaron Nguyen, an appellant. May it please the Court, I'd like to reserve four minutes for rebuttal, please. All right. We're here today in connection with a summary judgment decision in a 1983 wrongful conviction case arising from a police report that entirely mischaracterizes the interrogation of a teenager who was isolated, tricked, and pressured for hours to say that her and her boyfriend were at the scene of a gang confrontation. This interrogation ultimately generated both false admissions and a diagram that the police falsely characterized as depicting the crime scene. The decision below acknowledges that the report contained discrepancies and errors, and the decision below recognizes that the interrogation involved inappropriate tactics, but it considered both the errors in the police report and the tactics insufficiently serious to support a fabrication claim. Both of these conclusions rested on an impermissible weighing of the evidence, construing the factual disputes in favor of the moving party. I want to start with some background issues that are key to understanding what happened. Aaron Nguyen's conviction was one of the rare convictions reversed for insufficiency of the evidence, and the appellate court decision acknowledged that the case hinged entirely on the testimony of Nina, Aaron's then-girlfriend. It was uncontested that the prosecution's three eyewitnesses said they didn't see Aaron at the crime scene. It was undisputed that the GPS evidence placed him 3.6 miles away shortly before the shooting, and that corroborated his alibi, and the prosecution's own gang expert testified that Aaron was not a gang member. This is important because Nina's short-lived admission supplied the only evidence that Aaron was near the crime scene. And in closing, the prosecutor, in the closing of the criminal trial, told the jury to essentially disregard all of the exculpatory evidence and focus on the diagram that Nina had drawn during her interrogation. Can I ask you, you mentioned the allegedly misleading or false statements in the police report. Can you just explain what your theory of causation is with respect to those? Because the police report was not introduced at trial. So just how is that causally related to your claims? Well, sure. The police report was used to initiate the prosecution, and at the end of the police report, Detective Lord said, I'm asking for Aaron Nguyen to be arrested and charged for murder. I'm arresting him for murder, and I'm asking him to be charged with murder. And as the Ninth Circuit's decision, I believe in the Lisker case, establishes, police reports have independent evidentiary value. They're used for making charging decisions. They are used for plea bargaining. They are used at various different procedural steps pre-trial. And in this case, it was the police report that supplied the overview of the evidence that was the evidence, the purported evidence against Mr. Nguyen, and it was the police report that was used to initiate the prosecution. But, Erin, I guess maybe this is beyond the scope of what's before us right now. I'm just wondering, if the case were to go forward, the damages mostly flow from the conviction, not from the initial arrest, right? And it seems like there isn't a causal link between the police report and the conviction. Is there? Well, there is a causal link, and I'll get to that. A couple of things. First of all, the damages do flow from the police report because Aaron was held pre-trial for six years before the trial. So the pre-trial proceedings span six years. Then there was the trial, and then he was held for an additional three years. The police report was used not only for the decision to prosecute and move forward, but this is in the record below. The prosecutor used that police report to prepare Nina Nguyen to testify in his criminal trial. So when she came in to be prepared, this is according to her deposition testimony, and it's in the briefing below. It's not in the briefing before this Court, that when he brought her in to prepare her to testify in the criminal trial, he used the police report and used the false police report that completely mischaracterized her interrogation to prepare her to testify at trial. So the police report had, and this is common in criminal cases, it had a number of implications, including it was used to prepare witnesses. Well, I guess the defendants here suggest that it's, at least with respect to one of the statements, she admitted she was there with Aaron, that that was just a transcription error. So how should we draw this line? We're talking about trying to create clearly established rules so that officers in good faith can follow the Constitution. How do, why should we, why should that fall within it if it's a comma or a period is the difference? When you construe the facts favorable to the non-moving party, it's very clear that this is not an error of punctuation and it's not an error of timing. There are two statements on page seven of that report. One is Nina admitted she was down at the Feehong, which was absolutely false. Nina did not admit during the first interrogation that she was down at the Feehong, not once. In fact, she told them 10 times to the contrary, I was not there. The sheer number of omissions there in and of itself supports the inference that this was not just carelessness or a transcription error. But then the police report says, and I showed her a photo of the Feehong. This is the first time that she understands where they're talking about, because this photo has the words Feehong on it. It's the first time those words enter this interrogation. And the second that she looks at it, she says twice unambiguously, I was not there. I was not there. We think those facts are more than sufficient to support the inference that this was not carelessness. This was not a transcription error. The district court's decision below does get a significant point on this incorrect. The district court in the decision below says that after she was shown a photo, that she later admitted in the first interrogation that she was at the Feehong. The defendants, I think, concede that that's not what happened, that from the point that she was shown a photo, she absolutely does not admit that she was at the Feehong. She says repeatedly over and over, I was not there. And our position is that the facts support the inference that she did not admit to being at the Feehong any time during that first interrogation. She held her ground against relentless lies. Every time she tried to tell them that I was not at the – every time she told them her story, they accused her of lying. And then they tried to disorient her with lies of their own by showing her – saying over and over again, we have cell phone GPS evidence that puts you right there. And when she still didn't budge, they pulled out the forensic reports, the maps of the cell phone GPS evidence with the little dots on them and said, look at this. Now are you going to believe us? So what are – I understand in terms of – the clearly established analysis. We seem to have a couple of different theories at play. One is fabrication. So we've got misstatements, misrepresentations. Police report seems to fall within that bucket. I'm not sure what we're supposed to do with this other evidence that suggests undue coercion. Because we've got – in order to kind of establish the – that side of the Devereaux violation, we've got Gauss-Fick and Gant that are kind of our two – seem to be our two cases. Let me know if I'm missing something. But doesn't – Gauss-Fick seems to suggest a pretty demanding test that may not be met on these facts to show coercion for purposes of fabrication claim. Well, the difference in Gauss-Fick is that we have a two-hour child interview, and there were no breaks during this two-hour child interview. And what the court said in that case was that Gauss-Fick failed to show by independent evidence that the investigator knew or should have known that the interview tactics would yield false information. First – and I can go through this in a minute – our case has extensive evidence that the investigators – of independent evidence that the investigators should have known that they were eliciting false evidence. But more importantly, Gauss-Fick doesn't have any of the coercion that appears in this case. There were no allegations of yelling, screaming in someone's face, physically intimidating with a foot on their chair or finger in their face, calling them – using profanity, which is in the record. There were no allegations. But Gauss-Fick isn't – I mean, that involves, I think, a younger child who's disabled and looking for – I mean, there seemed to be other circumstances that suggested in those instances it was, in effect, quite a bit more coercive. I think there's no – I mean, Gauss-Fick involves an interview of a child. There's no allegation in Gauss-Fick that that child was interrogated by – which is to say that there are no allegations in Gauss-Fick that anyone was accusing that child of lying or trying to deceive them with false lies about the evidence against them, telling them that they have them on camera. But why does this line up more with Gantt, or is there a better case out there that I'm missing? I mean, Gantt is quite a bit on the other side of the spectrum in terms of the circumstances. But let me know if that's your best case or if there's another one that I'm missing for purposes of the coercion. I think Gantt is a very good case. Gantt was an adult who was interrogated. And again, the officers didn't try to disorient the witness with lies. They didn't – there was no allegations of screaming or yelling or physical intimidation. So the coercion in this case, which involves a juvenile, far exceeds the coercion that was used in Gantt. In Gantt, the concern was that the person was sleep-deprived. They had been up all night. But the interrogation itself didn't involve it. And under the influence of crack, right? Well, the report says that they were under the influence of crack and that the person was sleep-deprived. I'm not sure whether someone physiologically could be under the influence of crack for the duration of a – I think Gantt was a six-hour – four to six-hour questioning. But, yes, the person said that they had – the person said that they had used crack prior to the interrogation. How do these two fit together and let us know if there's a separate category I should be thinking of? But so you've got coercion, which is a quite demanding test, at least in terms of our cases in its application. Then we've got the misstatements. Even if the coercion isn't enough on its own, it seems like you're drawing a link between – the misstatements are in part – the predicate for some of the misstatements were created in part by coercive methods that may not alone – if we assume that they don't alone satisfy our prior application of that test. Do they somehow bolster the misstatement side of it?  Our position is that the mischaracterizations in the police report concealed every single fact that would have been used to assess the voluntariness of Nina's statements. But are those misstatements somehow a worse violation because of the coercion around them? Even the coercion standing alone may not meet our case laws test. Well, I think that the totality of the mischaracterizations, when you look at them, every single one of the mischaracterizations cut in the direction of incriminating Aaron and hiding the coercive tactics that were used during that interrogation and hiding the fact – so we have the fact – they hid the fact that Nina had repeatedly described being at the 2,000 billiard hall. She said 2,008 times during the first interrogation, which is necessary to understanding the gist of what she's saying. It was also independently exculpatory because it showed that they had a friendly relationship with people in the victim group. So that completely transforms the import of what she said during the first interrogation. The police report hides the aggressive confrontation that Sergeant Martin engages in that I think would have terrified most adults when he pulls Nina into her office. The police report doesn't address that confrontation. The police report doesn't address that – she doesn't make her first admission that they were at the Feehong, first false admission, until five hours into this ordeal. When you read the police report – It's the confrontation, the coercion, though. I mean, that's typically something that we'd see in a police report where they're describing in such detail the particular techniques they're using. They may be coercive, but, I mean, usually we're looking at kind of the bottom line. Well, here the police report is outright misleading. It says that Detective Lord finds Nina, and she's crying, and that Sergeant Martin says that he had had a conversation with her on the break, and on that break Nina admitted that she had not been entirely honest. So because it's a half-truth that it explains what's happened but doesn't give the full context. It certainly doesn't explain why Nina is sobbing hysterically when the second interrogation begins, and that is because Sergeant Martin pulled her aside, put his finger in her face, and screamed in her face that she was a goddamn liar and a fucking liar. And Nina's been clear on this point from the day of the interrogation, through the trial, through her deposition testimony in this case. I guess with an eye on the clock, can we turn to the map? So, I mean, the map seems to be the one that maybe best illustrates this intersection between alleged coercion and a resulting misstatement. It's not – I mean, in the end, technically at least, it's not the officer's misstatement. So what are we to do with that? Does that make a difference? I know you don't think it does, but explain why. I mean, it's the witness who's creating it. Two points here. The officers are responsible for the integrity of their investigation, and so when a witness is drawing a diagram and says the restaurant is over here, placing it geographically near the restaurant, and then the officer has told her to write Westminster on that map, and she's clearly indicating while she's drawing this diagram that she's not talking about Westminster, then that officer, to submit that into evidence and not note somewhere in the report or somewhere else that he was the one that told her to write Westminster and she said something that was contradictory, we think does constitute fabrication of evidence. I do just want to – you asked about another line of cases with regard to the coercion, and I just want to very briefly finish answering that question, which is that when you look to the Ninth Circuit's decision in Tobias v. Arteaga, they do look to the involuntary confession cases in the criminal context. And when you look at the interrogation tactics that were used in this case, we're not talking about just reminders, to be honest. We're talking about tactics that would have been impermissible even in the interrogation of an adult suspect. And when you look at, for example, the Ninth Circuit's decision in Cooper in 1992, the tactics in that case are very similar. They parallel very closely the tactics in this case where they tell the person over and over, you know, we know you're saying that you didn't rape this person, but we have forensic evidence saying that you did. And he says, I respect your test, but I'm telling you right now, I have no memory of this. I just didn't do it. The tactics that are used in Cooper are very similar to the tactics in this case and would have – any reasonable officer would have known that these are precisely the tactics that could elicit false admissions. I also want to briefly address the state-of-mind standard. The support – just the decision below indicated that the conduct here did not shock the conscience. And the correct standard in this case is whether they exhibited reckless or conscious disregard for the consequences of their actions. And we don't think that there's a case that could better exemplify the deliberate indifference standard. Here, there's no question about whether they had the opportunity to deliberate. We actually hear part of their deliberation caught on tape when they inadvertently recorded themselves having a meeting after interrogating Nina and Aaron. And when the police office – Should we get to the other claims beyond – if we rule in your favor on qualified immunity, the remaining claims, or should we send that back to the district court? We would request that you send it back to the district court. The district court's decision on the Monell claims was derivative of the analysis on the fabrication claim for the most part. I think the district court then said that there was no additional evidence presented on the Monell claim. Also the parents' claims? That decision was derivative of the fabrication claim. Did you want to save the balance? I would like to save the balance for my rebuttal. Thank you very much. Good morning, if it pleases the court. Roberta Krause, appearing for the appellees. Turning first to the police report, that's their direct fabrication of evidence claim. It focuses on the single sentence in Lord's report that I showed Nina a picture, and she said that they were at Feehom. She said they had been there. Both clauses of that sentence are correct. She was shown a picture of Feehom two separate times. The fact that two separate clauses are both true does not mean that a sentence that combines those two clauses with an and is not necessary. A sentence can combine two clauses with an and, and both clauses can be true, and the sentence can be highly misleading by creating the impression of a causal relationship or a temporal sequence that doesn't exist, right? That's true, but if you look at the entirety of the report, that's refuted. So the two clauses are correct. She was shown the picture twice. The first time she said, I wasn't there. The second time she described how they exited the parking lot, what exit they went out of, what street they drove on, which implies that she was there. There were other times during her interrogation or interview where she admitted that they had been at Feehom, and then she changed her mind. So the two statements are correct. She was shown the pictures, and there were times during her interviews when she said that they had been at the Feehom. But the impression is, I mean, it creates the impression of a single event. Like, here's a picture. Oh, yeah, I was there. Which, having looked at the transcript of the interview, does not seem like a fair characterization of the interview. But if you look at the rest of the report, her equivocation was noted. Her confusion was noted. Her backtracking was noted. It was noted that when Aaron and Nita were put in a room alone together, they were both going back and forth, we weren't at Feehom, we weren't at Feehom. It's all in the evidence. It's in the report, and it's in the interviews. What about the incident? What about Sergeant Martin and the kind of leaving out there? Well, she was crying. She was crying. And she was crying when they started the second session of her interview. Which was immediately after. Immediately after. She cried for about three or four minutes. And after she stopped crying, the interview continued. And she explained, oh, he was in my face, and he was yelling at me and telling me, don't lie. He didn't threaten her. She was never threatened. She testified to that at the criminal trial. Was the first part in the report? Did she tell the officers, or did the officers report out that Sergeant Martin was in her face and yelling? The report was prepared by Sergeant Lord. So I don't believe that was in the report, but it was definitely in the video. That was then turned over to the district attorney. And one thing also that you need to keep in mind. The incident with Sergeant Martin was recorded on video. No, it was not. Her crying was recorded on video. Her statement about what Sergeant Martin had done. And Sergeant Martin was in the room when she was explaining it. And then when Nina and Aaron were alone in the room together, she again explained it to Aaron. She talked about it at her criminal trial. And the district attorney, the prosecuting attorney, was present in the police department while all of this was going on. He participated in conversations with the officers. And, in fact, he was listening in when the officers were talking about Aaron and Nina and were saying that, no, they're saying they were at a Vietnamese restaurant. They're corroborating each other's story. And the prosecuting attorney suggested, we may need to flip someone. We should put them alone in a room together. So this was not hidden. The equivocation, the denials, the confusion was all out there. It's all in the report. The prosecuting attorney was aware of it. What about the statement, she told me she would draw a map and I had her do this? That creates the impression that it was her idea, doesn't it? No, how that came down was she had volunteered to the officers about how they had engaged in a trapping in of a rival gang member's car. They didn't suggest that trapping in to her. She brought that out. She said that they had trapped a car in of a rival gang member. And so the officer said, I want you to do me a favor. I want you to draw me a picture of the trapping in. And then she said, okay. So she started drawing it. The officer never told her to write Westminster. That's not on the tape. What he said was, draw Westminster, just draw a street. And then he said, are those lanes? So as she's drawing the picture, he's saying, you know, to find the street, where are the lanes? So he could see how the cars are trapping in. She wrote Westminster. He never told her to write Westminster. When generally if you want someone to write something, you'll say, write this. He did not. He said, draw. She was drawing streets. So he did not coerce that. And all of this came out at the criminal trial for Erin. She was asked about that, and she said that it was an accurate depiction of what actually happened that night of the trapping of the cars, but that it happened by Mile Square Park. And that was the equivocation where it happened. So it wasn't coerced. It wasn't fabricated. It was she agreed to do it. And early on in her interview, he had said, you know, we want you to answer our questions. You don't have to, but we would like you to. You know, she was offered food. She was offered water. She was offered a restroom. She was offered her parents. There was none of the indicia for a coerced interview. That may be a little strong on summary judgment or qualified immunity. None? This is a girl. Unconstitutionally coerced interview. Because I think any interview, you're going to feel a little coerced when you're at a police department. And she said she was scared. When she showed up, she knew Puffy had been arrested. It was in Juby Hall. She knew other people had been arrested and were in jail. So scary for her, right? What do you say to your friend's argument, Tobias, in the Cooper cases that this was clearly established, unconstitutional coercion? The Tobias case involved a 13-year-old witness who was denied his parents. He was denied access to his attorney. He was subjected to coercive, almost torturous interview techniques in the year 2012. And the court said that it was not clearly established that that was improper. Our interviews took place in 2011, so I think that at that time it was not clearly established. Regarding Nina's age, they keep talking about these cases of minors, 13-year-olds, 14-year-olds. Nina was 17. She had been involved in a year-long relationship with someone 10 years older than her. She regularly went to parties with gang members. She drank alcohol. As it turned out, her mom wasn't even in the country at the time this happened. She had a 20-year-old cousin staying with her. She had a maturity level that you would not expect of most minors. And I think the officers were allowed to consider that. So just to go to the talk about exculpatory evidence being omitted, the report said things like, Nina seemed confused. Nina changed her story. Nina could not remember. Nina did not know. Nina told him she may have gotten some of the incident jumped or confused. Nina started to seem vague. Nina and Eric both were saying back and forth to each other they were not a Fijon. And Nina said drawing the map was a mistake. And she was referring to being at Miles Square Park. So all of that is in the police report. But the interview also shows that when Nina first showed up, she didn't remember anything. She thought they were at a Vietnamese restaurant, period. It's only as they questioned her more, said, hey, we have this evidence, encouraged her more, told her lies. She realized, okay, well, I was at Puffy's party. But then we went home. Was the evidence that they said they had and show her, was that actually corroborating evidence? If you look at some of the witness evidence, like the interview with Lisa Huynh, she put Aaron and Nina at Fijon the night of the shooting. There were a few other witnesses who said, yeah, we think that we saw them there or we saw them at the house after the shooting. And Nina admitted they were at the house after the shooting. But Lisa put them at Fijon. And at one point, Nina said that they were at Fijon. They parked next to Puffy's car. Puffy was the driver of the shooter's car. And in Puffy's car was Lisa and Skyler. And on the night of the shooting. I guess I should ask you differently given the posture of the case. Is all of the evidence that they used to draw her out on some of these points accurate? Corroborated evidence? No. No. We admit they lied to her about some things. They didn't lie to her about other things. Some of it was true. Some of it wasn't. Where's that line for clearly established? I think that in 2011, I think they were allowed to fabricate evidence. We have self-evidence. What about Devereux? I think even under Devereux, you could lie about some of the evidence you have. I think in Devereux, we actually just say you have a clearly established right not to have law enforcement fabricate evidence to use against you. How much is enough? So I would say that their evidence had a basis. It wasn't like completely fabricated. They had cell phone evidence. They had his cell phone pinging at a certain place. It was in the very early morning hours. I can't remember the exact time, 2, 3 o'clock in the morning. So their theory was that there would be time for the car to go from where it pinged to where the incident occurred. And, in fact, that's I think what the court of appeal kind of decided, no, there wasn't enough time. What are we to make of Devereux's clearly established law used in investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information? How do we work with that on summary judgment? I don't think that the evidence shows that the officers knew or should have known because so much of what she said but then backtracked on cooperated with what they already knew. So no reasonable jury could find that, right? Well, a reasonable jury did convict him, and a lot of this stuff was brought out at the criminal trial. You know, she reaffirmed her drawing. Yes, I drew that. Yes, it's accurate. Oh, but no, it wasn't. It was a trapping incident that occurred at another location on the same night. And then they had another witness that said, no, only one trapping incident occurred that night, and it was when the shooting occurred. So, you know, I just don't think that there was. But that's evidence as to what she ended up testifying to and playing out, but the question is whether the defendants knew or should have known those techniques. So that may or may not be probative of that question of the mental state, but on summary judgment, can we draw in all inferences in favor, the light most favor to the plaintiff here? Can we do that? But the evidence that they elicited, a lot of it was cooperative. A lot of what she said corroborated what they knew and what went down, and then she backtracked. But this isn't about the plaintiff. This is about the defendants. So is there not enough evidence here for a reasonable jury to determine that they knew or should have known? That the officers knew or should have known. Yeah, right. That's the question before us, Senator Devereux. I don't think the evidence shows that. There's no genuine dispute. Well, the district attorney had all the evidence, and contrary to what the opposing counsel said, he did not rely on the police report. He was there in the police department. He had all the tapes. He said that he's constantly reassessing, reviewing, seeing what witnesses he had, seeing what evidence he has, and deciding if he's going to prosecute and how he's going to prosecute. The criminal judge held him over for a trial. The jury, all this evidence was before the jury. It was all the conflicting evidence from Nina they convicted and one court of appeal justice. You understand that there would never be a clearly established right not to be wrongfully convicted by officers who knew or had reason to know if the fact of a trial and successful conviction were enough to vitiate that, right? They had a number of witnesses who put Aaron at the location. They have witnesses, and even Nina's own testimony was that when they were at Stonecrest Park, that's when the plan was made to track down the rival gang members and trap them in. So there was a lot of evidence. The only evidence was his denial that he was at Fee Hong, and the cell phone pings left that open as a possibility. I think that's all I have. All right. Thank you, counsel. Rebuttal. I'm going to start by quickly going through the independent evidence that the officers had to support the inference that they knew or should have known that they were eliciting false evidence in this case. First of all, the video establishes that Nina's diagram does not resemble the shooting at all. The diagram itself bears no physical resemblance to the shooting, and the officers knew that. Her diagram shows this boxing in of cars, which is a story that the detectives fed her. The term box first comes from an officer and then later comes out of her mouth as trapped. But in any event, the way that she draws the diagram, she draws the shooter's car on the right-hand side of what she thinks is the victim's car, but that's not what happened at all in the actual shooting. We have a video of it. The shooter's car pulls up on the left-hand side of the victim's car. She also completely misdescribes what she thought was the victim's car. The victims were driving a silver SUV, and she keeps saying that it's a white Honda Accord. Was that established at the time? In other words, would the officers have known that arrangement before the map was drawn? 100 percent. And the evidence for that is that they had the video of the shooting. If you watch the second interrogation closely, they keep coaching her over and over. When she says white Honda Accord is the victim's car, they keep saying, like, are you sure, are you sure? Because they've got the photo right in front of them during this interrogation of the silver SUV that they know is the victim's car. So they know she's getting the facts wrong. They also coach her repeatedly to say that she pulled out on Westminster. It takes four tries to get her to say, was it Harbor or Westminster? She says Harbor. She says Harbor again. She says Harbor again. Finally, they get her to say Westminster, because if it's Harbor, then it's wrong. They weren't part of this caravan or parade. They also had evidence in their hands that Erin and Nina were innocent. They had consistent alibis with each other that were corroborated by the cell phone GPS evidence. And they had video footage in their hand of the cars pulling out on Westminster. And that video of Erin's car was not in that video footage. Counsel, do you agree that all of this information was turned over to the prosecutor? All the video interviews and all of the evidence that was collected by the police, you agree that all of that was turned over to the prosecutor? With a report that misled regarding the contents, yes. Okay. So what do we do with the fact that all of this was turned over to the prosecutor? How does that affect the liability of the officers, the detectives? For purposes of Brady, I think the important thing here is that the police report itself is misleading, and it also doesn't capture the interrogation of Nina that was not captured on video. So Sergeant Martin's interrogation of Nina in his office is not on video. The police report also misrepresents three, it says that there are three witnesses who they had talked to who placed Erin in the Feehong parking lot. Those were also completely wrong, and this is in the briefing in the case below. I'm not sure it's the briefing here. But how can that be tied to the wrongful conviction if the police report wasn't before the jury? I'm sorry. I had moved on to a different point, Your Honor. But I just wanted to respond to my friend saying that they had all of this evidence that placed Erin in the parking lot of the Feehong, and also the statement that our case turns on just this one sentence in the police report that he showed her a photo of the Feehong, and she said she was there. It's the totality of the misrepresentations, including something I hadn't addressed earlier. At the end of the police report, it said that three witnesses placed him there, and that was untrue, and that's in the briefing. But one of the witnesses said that they saw a Camry, and Erin drove a Honda Accord. They didn't see Erin in a Camry because they said, oh, I saw a Camry. There was another person who said that they had seen Erin at a house party later that night, that they didn't place him at the Feehong, and the third person also did not say that they saw him in the parking lot of the Feehong. So you have those additional misrepresentations. I just want to be very clear that this turns on not just the statement about here's the photo and Nina denying what's in the photo, but it's the totality of the misrepresentations in the report. I also want to point out that Nina, when was interrogated as a suspect, she was not Mirandized that day, even though they may have told her, you don't have to answer our questions. They also told her multiple times throughout that interrogation, the quicker you tell us the truth, the quicker you can go home, which signaled to her very clearly that she was not free to go. Was she a suspect? She was interrogated as a suspect, and she testified under a grant of immunity in the criminal trial. And what is the, I mean, you can't assert a Miranda claim, a claim on her behalf, right? I mean, the violation of her Miranda rights is not a claim you can assert. So you're saying that that's relevant to the assessment of coercion? Absolutely. As recognized in federal decisions, the failure to Mirandize her is relevant to the coerciveness of the tactics. And I would say that, you know, whatever limits, this goes to the Cooper decision that's referenced in Tobias v. Arteaga. Tobias involves a 2012 interrogation, but the case references the Ninth Circuit's 1992 decision in Cooper and the 2010 decision in Crow, both of which clearly established the law here. And Cooper is a criminal case, and I would just say that whatever limits apply to the interrogation of adult suspects, at least the same safeguards should apply to the questioning of a juvenile third-party witness. All right. Thank you, counsel. You've exceeded your time. Thank you to both counsel. The case just argued is submitted for decision by the court. We will be in recess for 10 minutes. We'll be back at 1128. All rise.
judges: RAWLINSON, MILLER, JOHNSTONE